**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT FETTES,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 06-CV-429** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **ADAM HENDERSHOT, et. al.,** | : | **Magistrate Judge Mark R. Abel** |
| | : | |
| **Defendants.** | : | |

<u>**OPINION & ORDER**</u>

**I. INTRODUCTION**

This matter is before the Court on Defendants' Motions for Summary Judgment.  Plaintiff Robert Fettes brought several claims under 42 U.S.C. § 1983 and state tort law for wrongful arrest, false imprisonment, and excessive force against the following Defendants: (1) officer Adam Hendershot and his employer, the Village of Caldwell (collectively the "Caldwell Defendants"); (2) dispatcher Ryan Starr and his employer, Noble County (collectively the "Noble Defendants"); (3) officers Dan Milburn and Mark Delancy, dispatcher David Schick, and their employer, the City of Cambridge (collectively the "Cambridge Defendants"); and (4) corrections officers Todd Knauf, Eric Miller, Jackie Young, and their employer, Guernsey County (collectively the "Guernsey Defendants").

For the reasons set forth below the Court: (1) **GRANTS** the Caldwell Defendants' Motion for Summary Judgment as to all claims except Plaintiff's § 1983 claim against Hendershot for an unconstitutional traffic stop; (2) **GRANTS** the Noble Defendants' Motion for Summary Judgment; (3) **DENIES** the Cambridge Defendants' Motion for Summary Judgment as

to all claims except Plaintiff's state law claims; and (4) **GRANTS** the Guernsey Defendants' Motion for Summary Judgment.

## II. BACKGROUND

The Fettes family own and operate Plus One Pizza in Caldwell, Ohio. In March 2004, Agent Scott Bunting, an investigator for the Ohio Bureau of Workers Compensation ("BWC"), determined that Plus One Pizza had failed to pay statutorily mandated workers compensation premiums. Bunting served Plaintiff's son, Robert Fettes, Jr. ("Bob Jr."), president of the corporation, with a notice giving him seventy-two hours to pay the overdue premiums. When Bob Jr. failed to comply, Bunting filed a private criminal complaint against him with the Law Director's Office for the City of Cambridge. The Law Director's Office determined that there was probable cause to support the private criminal complaint and issued a warrant for Bob Jr.'s arrest. The warrant, however, was never reviewed by a magistrate and only included the name "Robert Fettes" and Bob Jr.'s home address. Notably absent was the suffix "Jr." Nor did the warrant contain Bob Jr.'s driver's license number, his date of birth, or his social security number.

In April 2005, officer Adam Hendershot of the Caldwell Police Department and another officer visited Plus One Pizza in search of Rachel Williams ("Rachel"), an employee, on an unrelated matter. Plaintiff's second son, Michael Fettes ("Michael"), was the manager on duty. Michael, who was dating Rachel at the time, permitted the officers to search the pizza parlor. They found Rachel hiding in the back room and arrested her. Approximately one week later, the officers returned to Plus One Pizza, again looking for Rachel. According to Plaintiff, the officers suspected that Michael was hiding his girlfriend in the back room and demanded that he consent to a search of the premises. This time Michael refused. Plaintiff alleges that Hendershot and his

partner then screamed at Michael and threatened to arrest him if he failed to produce his girlfriend.  Michael refused and the officers retreated to continue their search for Rachel.

One week later, on the evening of May 6, 2005, Plaintiff picked up Michael from Plus One Pizza.  Less than two minutes later, Hendershot pulled over Plaintiff for allegedly failing to stop at a stop sign.  Plaintiff denied Hendershot's allegation but offered his driver's license and registration.  Michael, who did not have identification, gave the officer his social security number.  Hendershot called Noble County dispatcher Ryan Starr to perform a routine warrant check on both father and son.  Starr found a warrant for Michael issued by the City of Cambridge in the LEADS system, an electronic database.  Starr then called City of Cambridge dispatcher David Schick to confirm the validity of Michael's warrant.  While searching for Michael's warrant, Schick noticed a warrant for the arrest of "Robert Fettes," issued pursuant to a private criminal complaint filed by the BWC.  Under the impression that Hendershot had pulled over the "Robert Fettes" named in the warrant, Schick told Starr that there was a warrant for Plaintiff's arrest.[1]

Hendershot arrested both men and arranged to tow their vehicle.  While they waited for the tow truck, Plaintiff expressed incredulity that he was the person named in the warrant.  As a result of Plaintiff's pleas of mistaken-identity, Hendershot called Schick with Plaintiff's social security number to confirm that he had arrested the right man.  Schick duly confirmed the arrest.  Hendershot then drove father and son to the county line where he handed them to City of Cambridge police officers Dan Milburn and Mark Delancy.

---

[1]It is undisputed that Plaintiff's warrant was not stored in the LEADS database but rather kept only in hard copy at the City of Cambridge Police Department.

Milburn and Delancy handcuffed the men for transport to Guernsey County Jail.  Plaintiff

repeatedly complained to the officers that his handcuffs were too tight and hurting his wrists.

They ignored him.  Upon arriving at Guernsey County Jail, Plaintiff protested to corrections

officer Jackie Young about the tightness of his handcuffs.  After conducting a brief search, she

removed them.  Guernsey County corrections officers then detained Plaintiff in a holding cell

and gave him a copy of his warrant.  Reading Bob Jr.'s address and social security number on

the warrant,[2] Plaintiff realized that it was actually intended for his son.  Plaintiff brought the

mistake to the attention of corrections officer Ron Fitch.  After comparing the warrant with

Plaintiff's driver's license, Fitch realized that the police had arrested the wrong person.  He

apologized and released Plaintiff, who went to the hospital for treatment of his wrists.

### III.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such

that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  But

"summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a

verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court must construe the evidence in the light

most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no

---

[2]As issued by the Law Director's Office, the warrant contained only the name "Robert
Fettes" and Bob Jr.'s home address.  Dispatcher Schick, after authorizing Plaintiff's arrest,
searched the City of Cambridge's electronic database for the identification numbers of the
suspect named in the warrant.  Between the time he hung up the phone with Hendershot and sent
the warrant to Guernsey County Jail, he wrote Bob Jr.'s social security number by hand on the
warrant.

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  But the non-moving party "may not rest upon its mere allegations."  Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV.  LAW AND ANALYSIS

Plaintiff asserts a number of claims under both 14 U.S.C. § 1983 and state tort law against the officers and their employers.  14 U.S.C. § 1983 provides:

> [e]very person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

By its terms, § 1983 creates no substantive rights; it merely provides a remedy for deprivations of rights established elsewhere.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 815 (1985).  In this case, Plaintiff brings: (1) a § 1983 claim against Hendershot for stopping his vehicle without probable cause; (2) § 1983 and state tort claims against all Defendants for wrongful arrest and imprisonment; and (3) § 1983 claims against Milburn, Delancy, and the City of Cambridge for excessive force.

## A.  TRAFFIC STOP

Plaintiff alleges that Hendershot stopped his vehicle without probable cause in violation of the Fourth Amendment.  Hendershot asserts that he is entitled to qualified immunity, an affirmative defense that a defendant state officer may raise.  *Siegert v. Gilley*, 500 U.S. 226, 231

(1991).  Government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This is an objective standard.  *Id.*

The Court must conduct a two-step analysis in adjudicating assertions of qualified immunity on summary judgment.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004).  First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right?" *Wilkie v. Robbins*, __U.S.__, 127 S. Ct. 2588, 2617 (2007).  Second, the Court must "determine if the right was clearly established, such that a reasonable officer would have known that his conduct was unlawful." *Id.*; *see also Wilson*, 526 U.S. at 609; *Dunigan*, 390 F.3d at 491. Ultimately, the applicability of qualified immunity is a matter of law to be decided by the Court applying the preponderance of the evidence standard.  *See Hunter v. Bryant*, 502 U.S. 224, 537 (1991); *Crawford-El v. Britton*, 523 U.S. 574, 594 (1998).

The Fourth Amendment prohibits unreasonable seizures by the Government.  *United States v. Arizu*, 534 U.S. 266, 273 (2002).  Under this framework, a police officer may stop a vehicle if he has probable cause to believe that the driver has committed a civil traffic violation. *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)).  Probable cause is a "flexible, commonsense standard that requires [the Court to determine whether] the facts available to the officer would warrant a man of reasonable caution" to believe that the driver committed a traffic infraction.  *United States v.*

*Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc).  The Court must therefore look to the totality of the circumstances.  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).

The probable cause inquiry in this case reduces to a question of credibility and therefore cannot be resolved on summary judgment.  Hendershot contends that Plaintiff failed to stop at a stop sign.  Plaintiff denies this allegation and accuses Hendershot of fabricating the traffic violation in order to justify an otherwise unconstitutional stop.  Hendershot cannot recollect any detail to corroborate his account of the incident, including: the direction he was traveling; the whereabouts of his vehicle when he observed the alleged violation; whether his vehicle was moving or stopped; and most surprisingly, whether it was light or dark.  By comparison, Plaintiff and his son have more detailed recollections.  Michael recounts that his father "hesitated at a stop sign.  I asked him why?  He took an extra long time at the stop sign."  (Michael Fettes Dep: 7:19 - 8:1, June 27, 2007).

The events leading up to the stop also bolster Plaintiff's contention that Hendershot fabricated the traffic violation.  One week before Plaintiff's arrest, Hendershot and another officer accused Michael of concealing his girlfriend in the back of the pizza parlor and threatened to arrest him.  A few days later, Hendershot stopped Plaintiff, who drove a bronze Ford Taurus identical to that driven by Michael.  Plaintiff argues that Hendershot stopped him in the hopes that Rachel might be in the car and thus invented a reason—Plaintiff's running of the stop sign—to justify an otherwise unconstitutional stop.

The inquiry must therefore account for the facts that: (1) Hendershot and another officer threatened unlawfully to arrest Michael a week before the stop; (2) Hendershot was still searching for Michael's girlfriend; (3) he saw what appeared to be Michael's vehicle; and (4) he

recollects none of the salient details of the traffic stop.  Plaintiff insists that he did not run the stop sign and Michael's testimony corroborates his account.  In the aggregate, this evidence creates a genuine issue of material fact as to whether Hendershot simply lied.  Such determinations of credibility are the unique province of the jury.  *McDonald v. Petree*, 409 F.3d 724, 731 (6th Cir. 2005).  Because it is clearly established that a traffic stop without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment, Hendershot is not entitled to qualified immunity.  *See Sanford*, 476 F.3d at 394.  The Caldwell Defendants' Motion for Summary Judgment with regard to this issue is therefore **DENIED**.

### B.  UNLAWFUL ARREST

Defendants mistakenly arrested Plaintiff Robert Fettes on a warrant for his son, Bob Jr. Plaintiff alleges that this mistake constituted an unlawful seizure in violation of the Fourth Amendment.  Defendant officers assert qualified immunity.  It is axiomatic that the Fourth Amendment prohibits an officer from making an arrest without probable cause.  *Beck v. Ohio*, 379 U.S. 89, 94 (1964).  The Supreme Court, addressing the constitutionality of mistaken-identity arrests, promulgated a simple rule: "when the police have probable cause to arrest one party, and when they *reasonably mistake* a second party for the first party, then the arrest of the second party is a valid arrest."  *Hill v. California*, 401 U.S. 797, 802 (1971) (emphasis added).

Although the Sixth Circuit has yet to address the standard for determining whether a mistaken-identity arrest pursuant to a warrant for another person violates the Fourth Amendment, other circuits have adopted the "reasonable mistake" test articulated in *Hill*.  *See, e.g., Rodriguez v. Farrell*, 280 F.3d 1341, 1346 (11th Cir. 2002) (holding that the arrest of a suspect pursuant to a valid arrest warrant for a different person was a reasonable mistake and

thus did not violate plaintiff's Fourth Amendment rights); *Patton v. Przybylski*, 822 F.2d 697, 698-99 (7th Cir. 1987) (employing the reasonable mistake standard in dismissing a § 1983 claim for a mistaken-identity arrest); *Rodriguez v. Jones*, 473 F.2d 599, 605-06 (5th Cir. 1973) (holding that the reasonable mistake test barred plaintiff from recovering under § 1983 against officers who forcibly entered his residence on the erroneous belief that he was a fugitive named in an arrest warrant).

Under the reasonable mistake test, an officer's good faith is insufficient to cleanse an otherwise unconstitutional arrest. *See Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). Rather, the Court must determine whether the arrest was objectively reasonable in light of the totality of the circumstances. *Id.*; *Hill v. Scott*, 349 F.3d 1068, 1072-72 (8th Cir. 2003); *United States v. Glover*, 725 F.2d 120, 122 (D.C. Cir. 1984); *Johnson v. Miller*, 680 F.2d 39, 41 (7th Cir. 1982). The question is therefore whether Defendants made a reasonable mistake in arresting Plaintiff pursuant to his son's private complaint warrant. Each party will be discussed in turn.

### 1. Hendershot

The record shows that Hendershot's mistake was reasonable. Upon stopping Plaintiff, it is undisputed that Hendershot called Noble County dispatcher Starr to check for any outstanding warrants. Starr, after consulting with City of Cambridge dispatcher Schick, told Hendershot of an active warrant for Plaintiff's arrest. Hendershot had no access to a computer and thus could not verify this information. When Plaintiff protested his innocence, Hendershot called the City of Cambridge to double-check whether he had arrested the right person. Hendershot gave

Plaintiff's name and social security number to dispatcher Schick, who reassured him that no mistake had been made.

Courts have denied relief under far more egregious circumstances.  The Eleventh Circuit affirmed the dismissal of a § 1983 claim against an officer who arrested the plaintiff on a warrant for an individual with a different driver's license number, address, social security number, weight, height, eye color, and scars.  *Farrell*, 280 F.3d at 1347.  The officer had a computer in his cruiser enabling him to see the discrepancies.  Nevertheless, the officer reasoned that the plaintiff's sex, age, race, state of birth, and tattoos matched the warrant and arrested him.  *Id.* The Eleventh Circuit affirmed dismissal because an  "arresting police officer[] need not act as judges determining the ultimate facts."  *Id*. at 1348 n.14.  The Court noted that "[t]ime was short in the situation facing [the officer]: a nighttime traffic stop."  *Id*. at 1348.  To expose the officer to liability "would likely deter future officers too much from making arrests in public places on valid warrants about which they do not have first-hand knowledge: the risk of error in identification, and then a lawsuit, would simply be too great."  *Id*.

Similar considerations militated against a plaintiff's mistaken-identity-arrest claim in *Johnson v. Miller*, 680 F.2d at 41.  The wrinkle in *Miller* was that officers mistakenly arrested the unfortunate plaintiff twice on the same warrant.  *Id*.  Despite acknowledging the first mistake, the police department did not correct the error and arrested plaintiff again under almost identical circumstances.  *Id*.  Nevertheless, the Seventh Circuit rejected plaintiff's § 1983 claim against the arresting officer, expressing considerable sympathy for police officers who must make an arrest under duress with incomplete information:

> [i]f an officer executing an arrest warrant must do so at peril of damage liability
> under section 1983 if there is any discrepancy between the description in the warrant

-10-

and the appearance of the person to be arrested, many a criminal will slip away while the officer anxiously compares the description in the warrant with the appearance of the person named in it and radios back any discrepancies to his headquarters for instructions.

*Id*.

By contrast to the officers in *Farrell* and *Miller*, Hendershot was utterly at the mercy of his dispatchers. Without a computer in his cruiser to examine the warrant, he relayed Plaintiff's identification first to Starr and then to Schick. He had no ability to independently confirm the identity of the person named in the warrant. When faced with Plaintiff's protestations of mistaken identity, Hendershot double-checked with the City of Cambridge. He could have done no more. His was a reasonable mistake.

## 2. Starr

Dispatcher Starr also acted reasonably. City of Cambridge Dispatcher Schick notified Starr of an active warrant for Plaintiff's arrest and confirmed its authenticity. Starr had no reason to discount the reliability of arrest warrants from the City of Cambridge. Nor could Starr cross-check the private-complaint warrant with Plaintiff's identification because it was not in any electronic database to which Starr had access. Like Hendershot, he was at dispatcher Schick's mercy. As a mere conduit of information between Hendershot and the City of Cambridge, there is nothing in the record to suggest that he acted unreasonably.

Courts have been reluctant to impose § 1983 liability on dispatchers confirming the validity of arrest warrants for officers in the field. In *Young v. City of Little Rock*, 249 F.3d 730, 733 (8th Cir. 2001), the Eighth Circuit affirmed the dismissal of the plaintiff's § 1983 claim against an arresting officer and dispatcher for a mistaken-identity arrest. Both failed to notice that the plaintiff's name was actually the target's alias. *Id*. But the Eighth Circuit held that the

-11-

dispatcher's mistake was not unreasonable, occasioned by "the press of business and by the speed with which officers' in [the dispatcher's] position were required to act." *Id*. at 734. Starr's conduct was no less reasonable: unlike the dispatcher in *Young*, he did not overlook an obvious detail that would have prevented Plaintiff's erroneous arrest. Rather, the City of Cambridge verified a warrant for Robert Fettes's arrest and Starr had no reason to suspect that the warrant was actually for Plaintiff's son.

### 3. Schick

The buck stops here. Upon receiving a call from Starr that Hendershot had pulled over Robert and Michael Fettes, Schick testified that he most likely found reference to Plaintiff's warrant in the three-ring notebook under the name "Robert Fettes." Schick then pulled a hard copy of Plaintiff's warrant from the city's files. Like all warrants issued on private complaints by the City of Cambridge, it was not reviewed nor approved by a neutral magistrate and it had no identifying information other than a name and an address. Schick mistook Plaintiff for the "Robert Fettes" named in the warrant and authorized his arrest without comparing the address on the warrant with that listed on Plaintiff's driver's license. This alone is not sufficient for liability to attach. *See Jackson v. Hoylman*, 12 F.3d 212, at *1 (6th Cir. 1993) (affirming the dismissal of a § 1983 claim for mistaken-identity arrest). But critically, Schick had reason to believe that private-complaint warrants issued by the Law Director's Office were unreliable.

Schick testified that it was his practice, when he authorized an arrest on a private-complaint warrant, to compare the arrestee's information with the target's social security number, address, date of birth, or driver's license number. His reason was simple: Schick testified that such warrants often named the wrong person:

Q:    Do you ever use the address listed on a private complaint to determine whether you have the right person?

A:    Yeah, to cross-check into the CAD [Cambridge Arrest Database] to see if it's got that address in here. There is a **confusion sometimes** with [private complaints] when [the law director's office] sends them down, there is no junior or senior. I'm a junior. So I know -- **Actually, there was [a warrant from a private complaint]** that came down for a trimming law, **and it was against my dad, but it had David Schick on it**. . .

I came to work and they are like, "You have a personal complaint against you." I said, "No, I don't know." It would be my brother who did that on my dad's property. But, yeah, junior and senior can be - - year, use the address, try to cross-check it in the CAD, and you can look in the court computer because you have the case number. If you can get into the court computer . . . it has the social [security number] or date of birth or driver's license [number], then you can match them up.

(Schick Dep. 29:14 - 30:10, June 20, 2007) (emphasis added). Schick's testimony is startling.

He knew that private-complaint warrants were unreliable because he himself had fallen victim to

the same carelessness that led to Plaintiff's arrest. The City of Cambridge almost mistakenly

arrested one of its own officers because of an error in a private-complaint warrant: this should

have been ample warning that the procedure by which they executed such warrants was deeply

flawed and created a significant probability of mistaken-identity arrests.

    Despite the fact that Schick typically treated private-complaint warrants with caution due

to their unreliability, he failed to exercise similar care in this case. Either Hendershot or Starr

relayed Plaintiff's address, social security number, and data of birth to Schick. Schick checked

neither the CAD nor the address listed on the warrant against this information. Such diligence

would have revealed that the warrant was not intended for Plaintiff but for Bob Jr.

    Perhaps most significantly, Hendershot called back to double-check that he had arrested

the right person. Hendershot had by this time handcuffed Plaintiff, placed him in the back of his

-13-

cruiser, and was awaiting a tow truck.  There was no time pressure, no chance that a criminal would slip away, and good reason to be wary of a mistaken-identity arrest.  Nevertheless, relying solely on the name "Robert Fettes," Schick assured Hendershot that he had arrested the right person.

The Cambridge Defendants have five counter-arguments.  First, they contend that Schick could not verify the target's social security number, date of birth, address, or driver's license number.  Defendants aver that only Agent Bunting of the Bureau of Worker's Compensation could have confirmed that the warrant was issued for Bob Jr. and not Plaintiff.  This is demonstrably false.  Schick testified that he regularly obtained such identification numbers to complete private complaints by cross-referencing the warrant with court documents in the CAD system.  In this case, mere minutes after authorizing Plaintiff's arrest, Schick looked up the complaint in the CAD system, found Bob Jr.'s identification numbers, and hand-wrote his social security number on the warrant.  Contrary to Defendants' assertion, Schick had the information to remedy the real risk of a mistaken-identity arrest at his fingertips, yet he did nothing.

Second, the Cambridge Defendants argue that the Supreme Court's decision in *Baker v. McCollan*, 443 U.S. 137, 143 (1979) bars Plaintiff's claims.  The *Baker* Court held that a policeman who executes a valid arrest warrant is not liable merely because the warrant was mistakenly issued.  The officer "may rely on the warrant, he does not have to cross-examine the judicial officer who issued it."  *Patton*, 822 F.2d at 699 (discussing *Baker*).  But in *Baker*, officers arrested the right person—the suspect for whom the warrant was intended—who was in fact innocent of the charges.  In this case, the officer arrested the wrong person.  *Baker* is

-14-

therefore inapposite. *See Id.*, 822 F.2d at 699 (distinguishing *Baker* from mistaken-identity arrest cases).

Third, the Cambridge Defendants argue that Hendershot, not Schick, arrested Plaintiff. Because Schick was not Hendershot's supervisor, they contend that Schick cannot be liable for Plaintiff's unlawful arrest. It is well-settled, however, that "§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, [courts] read § 1983 as recognizing the same causal link." *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). The Court must therefore consider whether Schick's failure to cross-check Plaintiff's information against that of the target was both the cause-in-fact and the proximate cause of Plaintiff's arrest. *Id.*

To determine whether a defendant was a cause-in-fact of plaintiff's injury, the Court must determine whether the harm would have occurred if defendant had behaved differently. *Powers v. Hamilton County Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007). Recall that Hendershot called Schick directly with Plaintiff's social security number to double-check that he had arrested the right person. Mere minutes after instructing Hendershot to arrest Plaintiff, Schick checked the CAD and wrote Bob Jr.'s social security number on the warrant. Had he simply looked up this information while speaking with Hendershot, he would have found that the social security number in the CAD did not match Plaintiff's. Nor did the address, date of birth, or driver's license number. But for Schick's failure to check, Hendershot would not have mistakenly arrested Plaintiff.

-15-

Proximate cause presents a closer question. Proximate cause "is not about causation at all but about the appropriate scope of responsibility. Proximate-cause analysis is a kind of line-drawing exercise in which we ask whether there are any policy or practical reasons that militate against holding a defendant liable even though that defendant is a but-for cause of the plaintiff's injury." *Id.* The proximate-cause inquiry thus reduces to a question of foreseeability. *Malley*, 475 U.S. at 345. The evidence suggests that it was reasonably foreseeable, given Schick's knowledge of the unreliability of private-complaint warrants coupled with the fact that Hendershot called back to double-check the identity of the target, that Schick's failure to cross-check Plaintiff's identity against the information in the CAD system would result in a mistaken-identity arrest. Schick testified as much when he admitted that he typically performs such checks because there is often confusion as to the identity of targets in private-complaint warrants. As such, a reasonable juror could conclude that Schick's failure to exercise similar caution proximately caused Plaintiff's injuries.

Fourth, the Cambridge Defendants argue that to hold Schick liable for Plaintiff's mistaken-identity arrest would be unprecedented. This is not so. The cases relied on by Defendants are inapposite: in *Johnson v. Miller*, 680 F.2d at 42, *Rodriguez v. Farrell*, 280 F.3d at 1347, *Terrell v. City of Cleveland*, 819 F.2d 290, No. 86-3468, 1987 WL 347477, at *2 (6th Cir. May 22, 1987), *and Patton v. Przybylski*, 822 F.2d at 700, the defendant officers had no reason to suspect, other than discrepancies between the plaintiffs and the description of the suspects in the warrants, that they were arresting the wrong person.

By comparison, in *Powe v. City of Chicago*, 664 F.2d 639, 648 (7th Cir. 1981), the Seventh Circuit denied qualified immunity under circumstances similar to those here. Officers

-16-

arrested Powe on a warrant for another man. The police eventually cleared up the mistake and released him. He was re-arrested on the same warrant some months later. The Seventh Circuit reversed a grant of qualified immunity to defendants. The Court noted that because "the authorities had reason to suspect that the name placed on the warrant was not the real name of the intended arrestee, then some other description of the intended arrestee, sufficient to identify him, must be included in the warrant." This mirrors Plaintiff's claim: where dispatcher Schick had reason to suspect that private-complaint warrants did not correctly name the suspect, a jury could find that a reasonable officer would check the target's identifying information against that of the arrestee.[3] The officer's knowledge of the risk is the key distinguishing factor in the case law between actionable mistaken-identity-arrest claims and those that fall short.

Fifth and finally, the Cambridge Defendants argue that to deny Schick summary judgment would impose a duty on dispatchers above and beyond that required by other courts and the Constitution. This overstates the Court's narrow holding. Here, the warrant at issue was neither reviewed nor approved by a neutral magistrate. Further, Schick had good reason to believe that the warrant was unreliable and could have easily verified whether the suspect was in fact the target. The Constitution "does not guarantee that only the guilty will be arrested." *Baker*, 443 U.S. at 145. Nor is the City of Cambridge required to include the social security number, date of birth, driver's license number, or other identifying information on arrest warrants. But because Schick knew of the unreliability of this particular species of warrant, and

---

[3]Admittedly, *Powe v. City of Chicago*, 664 F.2d at 648, relied on a different doctrinal hook. That court ruled that the warrant upon which plaintiff was arrested was defectively vague and thus did not give rise to probable cause to arrest him. *Id*. Regardless of the rational, the *Powe* court reached substantially similar conclusion in confronting similar facts.

because he had the time and the means to remedy easily the substantial risk of injustice, his mistake was not reasonable. Because it is clearly established that the Fourth Amendment prohibits an officer from making an arrest without probable cause, Schick is not entitled to qualified immunity. *See Beck*, 379 U.S. at 94.

### 4. Milburn & Delancy

City of Cambridge officers Milburn & Delancy are similarly situated to Hendershot. They picked up Plaintiff at the county line for transport to Guernsey County Jail. Hendershot had already arrested Plaintiff and dispatcher Schick had confirmed his identity. The officers had no reason to suspect that Hendershot had arrested the wrong person. Had the officers called Schick with Plaintiff's identification, he would simply have reiterated that Plaintiff was the "Robert Fettes" named in the warrant. Knowing that dispatch had already confirmed Plaintiff's identity, the officers did not act unreasonably.

### 5. Young, Knauf, & Miller

Plaintiff also brought § 1983 claims against corrections officers Young, Knauf, and Miller, for mistaken-identity detention in violation of the Fourth Amendment. Upon arrival, Young searched Plaintiff, emptied his pockets, and removed his handcuffs. Because the corrections officers were in the process of changing shifts, she placed Plaintiff in a holding cell until the incoming officers could book him. When the new shift began, Plaintiff got the attention of officer Fitch, who upon reviewing the warrant, realized that the police had arrested the wrong person and released him. Plaintiff spent approximately one hour at Guernsey County Jail.

Plaintiff alleges that the corrections officers' mistake was unreasonable. Plaintiff highlights Guernsey County's Jail Manual of Policies and Procedures that prohibits corrections

officers from taking custody of an individual without clear and documentary legal authority. Plaintiff argues that Young, Miller, and Knauf should have verified that he was the person named in the warrant before placing him in a holding cell. Plaintiff is mistaken.

The corrections officers never booked Plaintiff. They simply searched him and detained him until the incoming shift could examine his paperwork. In placing Plaintiff in the holding cell, they reasonably relied on Milburn and Delancy's representation that Plaintiff had been arrested pursuant to a warrant. When Plaintiff brought the mistake to the attention of the incoming shift, the officers duly released him. Obviously, Plaintiff "could not be detained indefinitely in the face of repeated protests of innocence." *Gray v. Cuyahoga County Sheriff's Dep't*, 150 F.3d 579, 582 (6th Cir. 1998). But there is no authority to suggest that it is unreasonable for a corrections officer to detain Plaintiff for a matter of minutes until, in the course of their duties, they can properly consider whether the suspect in custody is in fact the target of the warrant upon which he was arrested. The corrections officers did not violate Plaintiff's Fourth Amendment rights.

### 6. City of Cambridge

A municipality cannot be vicariously liable for the constitutional torts of its employees. *Powers*, 501 F.3d at 607 (citing *Monell v. Dep't of Soc. Serv's.*, 436 U.S. 658, 691 (1978)). Liability "will attach only where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). Where a "plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, [the Court must apply] rigorous standards of culpability and causation . . . to ensure that the

municipality is not held liable solely for the actions of its employee." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 405 (1997). As such, a "finding of culpability simply cannot depend on the mere probability" that inadequate training led to Plaintiff's purported injuries. *Id.* at 412. Rather, "it must rely on a finding that this officer was highly likely to inflict the particular injury suffered by plaintiff." *Id.*

Plaintiff alleges that the City of Cambridge's failure to train its officer proximately caused his unlawful arrest.[4] A policy of inadequate training or supervision is actionable under § 1983 "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). There are two subsets of inadequate-training claims. First, "in light of the duties assigned to [the police] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [city] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390; *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006). Second, liability could also attach if the police "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers, who, nevertheless, are deliberately indifferent to the need." *Harris*, 489 U.S. at 390; *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). Although Plaintiff does not specify, his claim falls into the latter category.

---

[4]Because the Court disposed of Plaintiff's unlawful arrest claims against Defendants Hendershot, Starr, Young, Knauf, and Miller, the Court need not address the liability of the Village of Caldwell, Noble County, or Guernsey County for unlawful arrest. *Smith v. Thornburg*, 136 F.3d 1070, 1078 n.12 (6th Cir. 1998) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 806 (1986) (holding that a §1983 claim against a municipality for inadequate training and supervision cannot survive where the court has found no constitutional violation by the officers)).

Plaintiff claims that the pattern of mistaken-identity arrests pursuant to private-complaint warrants should have been so obvious to the City of Cambridge that its failure to remedy the process by which the City issues such warrants or verifies the identity of persons arrested on such warrants amounted to deliberate indifference.  The City counters that there is no pattern of constitutional violations to support an inadequate-training claim.[5]  This is not so.  Schick testified that private-complaint warrants often cause "confusion" as to the identity of the target.  (Schick Dep. 29:17-19, Aug. 20, 2007).  Although the City provided extensive training in retrieving warrants from the LEADS database, it concedes that it did not train its officers on the proper procedure for cross-checking private-complaint warrants.  Not that the City was without warning.  Schick almost suffered the same misfortune as Plaintiff: but for the fact that he alerted the City to the error, it would have mistakenly arrested its own police officer on a similarly shoddy private-complaint warrant.  Proof of the pattern is in the pudding.  Schick testified that it was his personal practice, because of the unreliability of such warrants, to cross-check the identity of the arrestee with the target's identification numbers in the CAD.

The City's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability."  *Brown*, 520 U.S. at 407.  The City was aware that private-complaint warrants created a palpable risk of mistaken-identity arrest.  Nevertheless, the City failed to either train its Law

---

[5]The City also tries to shift the blame: because the BWC filed the private criminal complaint, the City argues that it cannot be liable for the defects.  But it is undisputed that the City of Cambridge's Law Director's Office prepared the complaint.  Bunting merely signed his name.  Although the BWC and Bunting may also be culpable, the City of Cambridge failed both to accurately prepare the warrant and verify Plaintiff's identity.  The City cannot shift the blame.

Director's Office to issue more reliable warrants or its dispatchers to cross-check the identity of an arrestee with the identification numbers of a target.

It is certain that "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of its action." *Id*. at 410. But as Schick testified, this was not an isolated instance. Plaintiff's mistaken-identity arrest was the foreseeable, arguably obvious, consequence of blatantly insufficient procedures and desultory training. There was more than a mere probability that dispatchers would inflict a constitutional injury. It was highly likely, given the inadequate training and poorly crafted warrants, that Schick would authorize a mistaken-identity arrest. The Fourth Amendment surely does not "guarantee that only the guilty will be arrested." *Baker*, 443, U.S. at 145. Nor does it tolerate a substantial risk that citizens will be mistakenly arrested. The risk "is all the more intolerable because it is [easily] avoidable." *Powe*, 664 F.2d at 648. Plaintiff's § 1983 claim against the City of Cambridge must therefore survive summary judgment.

### C.  STATE LAW CLAIMS FOR FALSE ARREST AND IMPRISONMENT

Plaintiff also brings claims against Defendant officers under state tort law for false arrest and false imprisonment, which in their essential elements are indistinguishable causes of action. *Feliciano v. Kreiger*, 362 N.E. 2d 646, 652 (Ohio 1977); *accord Bennett v. Ohio Dept. of Rehab. & Corr.*, 573 N.E. 2d 633, 640 (Ohio 1991). To prevail on a claim for false arrest and imprisonment, Plaintiff must demonstrate: "(1) the intentional detention of the person; and (2) the unlawfulness of the detention." *Hodges v. Meijer*, *Inc*., 717 N.E. 2d 806, 809 (Ohio Ct. App. 1998).

In an action for false arrest and imprisonment against law enforcement officers under Ohio law, "Fourth Amendment standards for determining lawful and unlawful detentions by the police are to be applied." *Finn v. Vill. of Amelia*, No. 88-10-073, 1989 WL 27770, at *3 (Ohio Ct. App. Mar. 27, 1989); *accord Harvey v. Horn*, 514 N.E.2d 452, 455 (Ohio Ct. App. 1986). An arrest or detention based on probable cause is lawful and, "thereby, serves to defeat a false arrest/imprisonment claim." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 315 (6th Cir. 2005). As such, only Plaintiff's claim against dispatcher Schick survives. Although the Court concluded that a jury could find that Schick's mistake was not reasonable and therefore violated Plaintiff's Fourth Amendment rights, Schick still may be entitled to summary judgment on Plaintiff's state law claims pursuant to the statutory grant of immunity under Ohio's Political Subdivision and Tort Liability Act. *Id.*

Ohio immunizes its political subdivisions and employees against actions seeking "to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function." Ohio Rev. Code Ann. § 2744.03(A). There is a proviso: an employee is not immune from liability if his actions were "manifestly outside the scope of [his employment]," or "were with malicious[6] purpose, in bad

---

[6]Ohio courts define malice as "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Boyd v. Vill. of Lexington*, No. 01-CA-64, 2002 WL 416016, at *6 (Ohio Ct. App. Mar. 14, 2002).

faith,[7] or in a wanton[8] or reckless[9] manner."  Ohio Rev. Code. Ann. §§ 2744.03 (A)(6)(a)-(b).
"Even where a police officer's actions violate the arrestee's constitutional rights, the officer is
not necessarily subject to liability." *Radvansky*, 395 F.3d at 316.  Particularly where an officer's
conduct is "not as thorough as it could have been," mere negligence is insufficient "to remove
the cloak of immunity."  *Boyd v. Vill. of Lexington*, No. 01-CA-64, 2002 WL 416016, at *6
(Ohio Ct. App. Mar. 14, 2002).

There is no evidence to suggest that Schick acted with an intent to harm Plaintiff or with
anything but a good faith belief that Plaintiff was the person named in the warrant.  Schick did
not intentionally deviate from a clear duty and his mistake, although unreasonable under the
Fourth Amendment, cannot be described as a "failure to exercise any care whatsoever."  *Id.*
Schick's conduct occupies the space between the Fourth Amendment's standards of
reasonableness and the malign intent or recklessness required to overcome Ohio's statutory grant
of immunity.  Accordingly, Defendants' Motions for Summary Judgment with respect to
Plaintiff's state law claims for false arrest and imprisonment is **GRANTED**.

---

[7]Ohio courts define bad faith as involving "a dishonest purpose, conscious wrongdoing,
the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or
an actual intent to mislead or deceive another."  *Id*.

[8]Wanton is defined as "the failure to exercise any care whatsoever."  *Id.*

[9]Ohio courts define reckless as the "intentional deviation from a clear duty or from a
definite rule of conduct."  *Id*.

## D.  EXCESSIVE FORCE

### 1.  Milburn & Delancey

Plaintiff alleges that the tightness of his handcuffs constituted excessive force in violation of his Fourth Amendment rights.  The Sixth Circuit permits a § 1983 plaintiff "to get to a jury upon a showing that officers handcuffed [him] excessively and unnecessarily tightly." *Burchett v. Keifer*, 310 F.3d 937, 943-44 (6th Cir. 2002).  To survive summary judgment, Plaintiff must show a genuine issue of material fact that: (1) his handcuffs were unduly tight; (2) he complained of their tightness to the arresting officers; (3) the officers ignored his complaints; and (4) he sustained some physical injury as a result.  *Kostrzewa v. Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (reversing a grant of qualified immunity on an excessive-force claim where plaintiff sustained serious injury as a result of tight handcuffing); *Martin v. Heidman*, 106 F.3d 1308, 1313 (6th Cir. 1997) (concluding that there was a genuine issue of fact as to an excessive-force claim where plaintiff's hands were injured after thirty-five minutes in unduly tight handcuffs).

Plaintiff testified that Milburn handcuffed him very tightly, hurting his wrists.  Plaintiff further testified that he immediately complained to the arresting officers, who ignored him. Once in the police cruiser, Plaintiff again complained about the handcuffs.  Again, neither officer loosened nor removed Plaintiff's handcuffs despite his protests of pain.  As a result, Plaintiff suffers from permanent neuropathy in both wrists, including persistent pain and numbness caused by the compression or crushing of his nerves.

Defendants argue that Plaintiff inadvertently tightened his handcuffs while the officers transported him to Guernsey County Jail.  In *Meadows v. Thomas*, 117 F. App'x. 397, 405 (6th Cir. 2004), the suspect's handcuffs were not unduly tight until the arresting officer placed him in

the back of a police cruiser. Thereafter, the handcuffs tightened, causing him pain and numbness. To no avail, Meadows complained to the officers. *Id.* Nevertheless, the Sixth Circuit found that the cause of "the increased tightness, if any, was [caused by] Meadows' own movements, or, at most, movement resulting from the vehicle." *Id.* The Court concluded that an excessive-force claim could not survive summary judgment merely "upon a showing that the handcuffs tightened or became very uncomfortable as a result of some action *other than the officer's* – or, as is likely in this case, a result of the plaintiff's own refusal to stop straining against the handcuffs." *Id.* But *Meadows* is inapposite. Here, Plaintiff immediately complained that his handcuffs were unduly tight *before* Milburn placed him in the police cruiser. The record therefore suggests that Milburn fastened the handcuffs too tightly and not that Plaintiff inadvertently tightened his handcuffs and thereby injured himself.[10]

Defendants also protest that Delancy cannot be liable for Milburn's misapplication of Plaintiff's handcuffs. The Sixth Circuit has unequivocally rejected this argument. In *Grooms v. Dockter*, No. 95-1261, 1996 WL 26917, at *3 (6th Cir. Jan. 23, 1996), the Sixth Circuit held that a non-supervisory officer who watched his partner unduly tighten a suspect's handcuffs and ignored the suspect's complaints can be liable for excessive force. *See also Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) (holding that a non-supervisory police officer has a duty to try to stop another officer who summarily punishes a person in the first officer's presence). Admittedly, a "non-supervisory officer may not be liable for conduct in which he or she was not directly involved if a reasonable officer would not have been aware that the conduct was

---

[10]Defendants also contend that Plaintiff's handcuffs were not unduly tight because the arresting officers handcuffed Plaintiff's son in the same manner and he did not complain. Whether Delancy properly applied Michael's handcuffs has no bearing on Plaintiff's claim.

occurring." *Grooms*, 1996 WL 26917, at *3 (citing *Gibson v. City of Clarksville*, 860 F. Supp. 450, 463-64 (M.D. Tenn. 1993)).  In this case, however, it is undisputed that Delancy witnessed Milburn handcuff Plaintiff and heard Plaintiff's complaints.  As such, there is a genuine issue of material fact as to whether both Milburn and Delancy are liable for excessive force.

"It is clearly established that handcuffing an arrestee in an objectively unreasonable manner is a Fourth Amendment violation." *Marvin v. City of Taylor*, 509 F.3d 234, 248 (6th Cir. 2007); *accord Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004); *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 173 (6th Cir. 2004).  Accordingly, Milburn and Delancy are not entitled to qualified immunity with regard to Plaintiff's excessive force claim.

### 2.  City of Cambridge

Plaintiff further alleges that the City of Cambridge's failure to train its employees on the proper application of handcuffs constituted deliberate indifference to his constitutional rights.  A policy of inadequate training or supervision is actionable under § 1983 where, "in light of the duties assigned to [the police] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [city] can reasonably be said to have been deliberately indifferent to the need." *Gregory*, 444 F.3d at 753. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

Plaintiff contends that his injuries are the direct result of the City of Cambridge's failure to train its officers on the dangers of excessively tight handcuffing.  Although Plaintiff cites to no other instance of excessive force, the Supreme Court has held that a "plaintiff might succeed

in carrying a failure-to-train claim without showing a pattern of constitutional violations . . . in a narrow range of circumstances, [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. Absent a pattern of abuse, deliberate indifference is a function of the (1) "likelihood that the situation will recur"; and (2) the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.*

The City of Cambridge concedes that it does not offer any training in the application of handcuffs. The City, however, contends that officers receive such training at the Ohio Peace Officer's Training Academy ("OPOTA"). Although it is undisputed that the police academy teaches aspiring officers to handcuff suspects behind their back and to double lock the handcuffs, the record suggests that cadets receive no training as to the dangers of injuring suspects or in responding to complaints of pain or discomfort. Milburn testified:

> Q:    Do you recall any training during the OPOTA program about the use of handcuffs?
>
> A:    No.
>
> Q:    Do you remember being trained either at OPOTA or at the Cambridge Police Department about what to do if someone complains about that handcuffs are too tight?
> . . .
> A:    No.

(Milburn Dep. 13:4-13, July 26, 2007). The City counters that an individual officer's failure to recall his training is not sufficient to show a systemic failure to train. Quite so. Milburn's

clouded memory of training is not sufficient to establish a "policy" of institutionalized indifference that constitutes a "moving force" behind unconstitutional conduct.[11]

But both Milburn and more significantly, Cambridge Police Chief Wayt, testified that excessively tight handcuffing does not constitute the use of force, let alone excessive force. Wayt's testimony is particularly disturbing:

> Q:      But it's your opinion that if the officer doesn't have intent to case harm, then applying handcuffs too tightly would not constitute excessive use of force?
>
> A:      I don't think it is a use of force.

(Wayt Dep. 24: 12-18, July 26, 2007).  According to Wayt, handucffing a suspect too tightly cannot constitute the use of force, let alone excessive force, without the officer's subjective intent to injure.  He is incorrect.  The Sixth Circuit has consistently held that handcuffing constitutes the use of force and that the officer's subjective intent is irrelevant to whether he violates a suspect's constitutional rights.  *Champion*, 380 F.3d at 902.

Milburn is even more ignorant of a suspect's Fourth Amendment rights.  He testified:

> Q:      Do you consider the use of handcuffs the use of force?
>
> A:      No.
>
> Q:      Do you believe that the use of handcuffs can be excessive force?
>
> A:      No.

---

[11]The City of Cambridge also protests that it has a policy stating that "[m]edical treatment will be sought or provided when necessary when a person taken into custody is ill or injured. The prisoner should be handcuffed behind the back and the handcuff double locked when practicable." (Def. Exh. C).  The City contends that the existence of the policy shields it from liability for inadequate training.  It does not.  Whether there is a policy on paper that in theory, should protect Plaintiff from injury, is not probative to Plaintiff's claim that the City's deliberate indifference to training its officers in the application of handcuffs directly resulted in the violation of his Fourth Amendment rights.

(Milburn Dep. 39:14-21, July 26, 2007).  This testimony is startling: it shows that the City has not imparted the basic understanding that unduly tight handcuffs might constitute excessive force.  Given the frequency with which police officers must use handcuffs, it was a near certainty that Milburn, on account of the City's dereliction, would injure a suspect.

It is undisputed that the City provides no training to its officers on the dangers of injuring a suspect by handcuffing him too tightly.  It is the testimony of both the police chief and an individual officer that handcuffing a suspect does not even constitute the use of force, let alone excessive force.  The City disregarded a known and obvious risk, such that the need for even a modicum of training on the dangers of handcuffs was so obvious and so likely to result in a violation of a suspect's constitutional rights that a reasonable jury could conclude that the City was deliberately indifferent.  *See Gregory*, 444 F. 3d 725.  This glaring omission is sufficient to satisfy even the stringent standard of fault required for municipal liability.  *See Brown*, 520 U.S. at 410.  The City of Cambridge's Motion for Summary Judgment with respect to Plaintiff's § 1983 claim for excessive force is **DENIED**.

## V.  CONCLUSION

For the foregoing reasons, the Court: (1) **GRANTS** the Caldwell Defendants' Motion for Summary Judgment as to all claims except Plaintiff's § 1983 claim against Hendershot for an unconstitutional traffic stop; (2) **GRANTS** the Noble Defendants' Motion for Summary Judgment; (3) **DENIES** the Cambridge Defendants' Motion for Summary Judgment as to all

claims except Plaintiff's state law claims; and (4) **GRANTS** the Guernsey Defendants' Motion

for Summary Judgment.

     **IT IS SO ORDERED**.


                     **s/Algenon L. Marbley**
                    **ALGENON L. MARBLEY**
                    **UNITED STATES DISTRICT COURT**

**Dated: September 8, 2008**